Good afternoon everyone. We're here today for oral argument. This is Appeal 25-2018 United States v. Jamic Johnson. We'll begin with argument on behalf of the appellant, Mr. Patton. Thank you, Your Honor. When a police officer is interrogating a defendant and tells the defendant, just be honest, this can't get you any more trouble than you're already in, then the government can't use any statement that the defendant makes thereafter to put the defendant in worse trouble than the defendant's already in. That's pretty straightforward and I would hope would be pretty uncontroversial. And that's what happened in this case. Mr. Johnson was questioned and it was a fairly lengthy statement broken down into three spots, three different phases, and he'd already been through two phases. He's an adult. He has an experience with the criminal justice system. He was Mirandized when he was talking during the first two phases. You can watch when you see on the video. He's weighing the pros and cons of admitting to further criminal conduct and what the officers already had on him based on the search of his house. I think you agree that this issue was not raised below. Well, no. There was a challenge to how much total methamphetamine Mr. Johnson was accountable for. By this issue I meant the Fifth Amendment issue. It's a different argument in support of the claim that the amount of methamphetamine he can be accountable for. So I think under Yee and Boo and Billups that it's not waived. I'm not going to try and necessarily die on that hill because I think we win under plain error. I guess, assume it wasn't raised below. Not the waiver versus forfeiture issue, but is it your contention that the district court should have just sua sponte identified this Fifth Amendment issue and raised it with the parties? Well, I think she should have in a perfect world, yes. Is it your argument that the law requires her to sua sponte raise this Fifth Amendment issue even though it wasn't raised? No, I don't think the law required her to, but the district judge said that she had watched the video. And when I watched the video, which we didn't have the first time around, it's kind of lengthy. You're watching it and then there's the break. But when that officer came back in, Wagner came back in and he said, hey, just trying to get this straight, just be straight up. This doesn't get you in any more trouble than you're already in. I mean, just immediately, you're like, well, wait a minute. What did he just say? And I rewound it, well, it's my age, you don't rewind it, but go back on the CD. I'm like, wow, he just really said that. And to me, I think it just jumps off at you. And so I think, yes, in a perfect world, the fantasy world where if I were ever a judge, I'd look at that and be like, I have a problem with this. My experience in sentencing is judges are a little more willing to insert themselves because they're the ones imposing the sentence. I've had judges, to my chagrin, give the government some extra swings at the ball because they think they may have missed something. But out of a sense of, I'm the one imposing this sentence, I want to make sure it's right. But no, the judge is not required to raise it on her own. Mr. Patton, with regard to the third and fourth steps of plain error, what the guidelines range would have been if the court had affirmed Johnson's objections? That was clear to everyone, right? The ranges? The range, she made her pre-sentencing ruling that set out the range, and she stuck with that ruling at the sentencing. Yes, that range of a guideline range of the 135 to 168 on count one, yeah, that was, she put that out before sentencing, and she affirmed that after she heard her argument at the sentencing. There might be a little difficulty in the sense that when the judge was pronouncing sentence, it seemed like she took Johnson's statement out of context about the PSR and the nine, reaching the number nine, after subtracting to avoid the double counting, and Johnson had reached it before. Right, that was in her written ruling beforehand, and we laid that out in the brief, and I have it here, and she said what is clear in the revised PSR, and Johnson's counsel agreed, is that Johnson purchased at least nine ounces of methamphetamine from Lance and Bonk, then she cites to the defendant's, the docket entry for the defendant's sentencing memorandum, and then the total ounces purchased should have been nine ounces. So I think, yes, very much, and I think you're right that what she didn't get is that Mr. Johnson's statement, which included the almost four ounces found in the house, where I don't see how else you can interpret that written statement, and it seems to me, the judge put it in there to try and show, I think mistakenly, that she was coming to the same calculations as Mr. Johnson was, when that just wasn't the case. Moving to the second step of plain error, even if the court committed a constitutional error, isn't there a reasonable debate to be had as to whether Wagoner's statements constituted a material false promise of leniency? I know you say it's apparent from when you watch the video, but if there is a debate, then we have an issue with regard to the plainness of the error, correct? That would be correct if there's a debate on it. I don't think there's a debate, and this gets to a standard of review of clear error or de novo, where you have, it's on the video, right, and you all have the exact same evidence and the same quality of evidence that the district judge had. If she didn't have any advantage through seeing somebody testify that you all can't see testify, it's right there, which is why the Supreme Court and this court has commented that when you have video like this, really you can do a de novo. Now, that's different than plain error, I get, but I just don't think that it's debatable that a promise was made here, and I think part of, I think just what the words Wagner uses say it, but the context as well, because remember, at the end of the second phase of Johnson's questioning, it ends with everybody agreeing Mr. Johnson's going to cooperate, right? And the agents say, all right, we've got to go out and make a call about what charges we're going to file and to try and follow up on the cooperation, and the agent on the last way out is like, think about what shipments you can give, that's what we're interested about, think about that. It's in that context that Wagner comes in and says, hey man, we're just trying to figure things out, help me understand, don't worry, this isn't going to get you into any more trouble than what you're already in, and they're trying to figure out between Lance Johnson and Bunk, who was Johnson getting from first, just what the order was, and I don't think any reasonable person, given those circumstances, and then the circumstance of, I don't think it was an accident that Wagner was the one that came back in to do that questioning, because Wagner was the one that knew Johnson from before, that he's just saying, hey man, just be straight up, we're trying to figure out how we're going to do this cooperation. To do that, we want to make sure we understand the relationship between Bunk and Lance. So I really don't think there can be any real dispute that this was a promise that just what Wagner said, be up front with us, don't worry about minimizing or anything, because we're not going to use this to put you in a worse position. Mr. Patton, there's some suggestion in the government's brief that what the officer was referring to was that no additional charges would be filed, not that it wouldn't impact some sort of sentencing that might come along later, and the context that you describe seems to at least make that plausible. The officers went out to check on kind of what charges the district attorney was considering, and then came back right after that call. What is your response to that argument? Well, a couple, Your Honor. Number one, that's not what Wagner said, right? He didn't say, hey, just be up front. This isn't going to get any new charges on you. This isn't going to put you in any worse position than you are already in. It's not limited in any way. And I kind of made this point in the reply brief that, like with Miranda warnings, they don't try and explain to a defendant all the various ways a statement can be used against them. They just say, are you aware that any statement you make can be used against you? Because it's impossible at that point to detail all the various ways it might hurt you. Well, this is the flip of that, right, in that when you say, hey, whatever you tell us isn't going to be used to put you in a worse position than you're in now, that covers the waterfront. And especially since no charges were pending yet, you know, there's no baseline to even, you know, make a calculation on, right, of, you know, how do you know if any additional charges are going to get filed when you don't know what the charges, when no charges have yet been filed against you? So I just, I don't think that given those things that it makes any sense that any, that a reasonable person sitting there listening to that would interpret that statement as, we won't file any new charges when we've just told you, we don't even know what charges are going to be filed against you. Again, that's one of the last things on their way out the door, what the agent said they had to make a call to find out what the charges would be. Mr. Benton, with regard to the sentencing guideline calculation itself, if the district court had granted the objections that Mr. Johnson raised as sentencing, what would the guideline be at that point? It would have been a range, a final offense level of 29, that would have been a base offense level of 30, plus two for maintaining a premises, minus three for acceptance. So a 29 criminal history category three would be 108 to 135 months, but because of the mandatory minimum, the 10 years, the guideline range would become 120 to 135 months. And the sentence he received was for 135 months? Yes, he got 135 months on count one, the drug count, with the mandatory consecutive 60 on the 924C. So isn't that within the guideline range, although on the top of the guideline range of what the sentencing range would have been had the judge granted Johnson his objections? It is the very top of the guideline range that would have applied if he granted. But the government has made an argument about an inoculating statement. I don't think the judge's inoculating statement was, number one, either specific enough, and number two, just didn't explain a parallel result. Because number one, well, a couple levels of that. When the judge announced her sentence, she said, this is a guideline sentence, and I think this guideline sentence is sufficient to achieve the sentencing factors. So when she's explaining it, she's directly tying it to the guidelines, and it's the bottom of the guidelines. Then she just does what I would argue is just the most generic of inoculating statements of, well, and even if I granted any of the defendant's objections, this is the sentence I would have imposed. And this court has pretty regularly explained that that type of general statement can't be enough of an inoculating statement. Because then, as the court explained, it would basically overrule the Supreme Court saying that ordinarily guideline errors satisfy both the third and the fourth prong of plain error. And so if you just let the judge say, if there were any errors, it doesn't matter because this is what I would do. The reason I ask is because typically, if a sentence is within the guideline range, we afforded a presumption of reasonableness, right? Yes. And here, the 135 would be, although on the high end of the guideline range, within the guideline range, even under the sentencing guideline that Mr. Johnson advocated for. It's true, but I think you don't want to mix two different presumptions. There's a presumption that are within guideline range. On appeal, you can presume that that's reasonable. But there's also a presumption that a guideline error is presumed to be harmful unless the judge gives a real, true, very detailed explanation of why that would not be the case. Would you like to reserve the remainder of your time? Yes, I would like to. Very good. Thank you, Mr. Patton. Mr. Falvey, we'll now move to you on behalf of the government. Good afternoon, Your Honors. Joe Falvey for the United States. May it please the Court. There are two basic threshold reasons why this Court should affirm without even having to reach the merits. First, the defendant waived his constitutional challenge. And second, the district court made clear that it would have imposed the same sentence regardless. And for that reason, any error was harmless. It didn't affect the defendant's substantial rights and didn't gravely impugn the proceedings below. So starting with the waiver issue, cases like Aslan and Heckey show that when a defendant relies on evidence in the district court to advance alternative interpretations of that evidence, the defendant can't turn around on appeal and argue that the district court should not have considered that evidence at all. Instead, this Court holds in Aslan and Heckey that the defendant has waived any sort of argument for the exclusion of the evidence. I take the defendant's primary response— But those cases dealt with a challenge to the reliability of the underlying evidence. And that makes sense because you can't argue later that something that you relied on for your own arguments below was unreliable. But here, we're not talking—the government is—I mean, the defense is not making a reliability argument, right? It's saying that just as a matter of constitutional rights, that we shouldn't consider those statements, not that the statements were not reliable. Your Honor, I don't read Aslan and Heckey to hinge on the type of new argument that the defendant tries to raise on appeal, whether it be reliability or authenticity or exclusion on constitutional grounds. I read them to hinge on what the defendant did in the district court. And what the defendant did in the district court in those cases and here is rely on a piece of evidence and urge the court to consider it and interpret it how the defendant wanted. And so that sort of intentional decision in the district court is how I read Aslan and Heckey to find that waiver occurred. But if the court ultimately disagrees with us on that point and finds that the issue, the constitutional challenge was not waived, we do think that the issue is reviewed only for a plain error. The defendant didn't raise any sort of exclusion argument in the district court, let alone one based on the Constitution, let alone one based on the Fifth Amendment. So we think plain error review would apply to the constitutional challenge and no plain error occurred here for a few reasons. Let's unpack that. On the error or plain error, the first two elements, and you're free to argue inferences here, but how does the phrase, quote, this doesn't get you in any more trouble than you're already in, meaningfully differ from nothing you say will be used against you? Your Honor, we think in context, it's more general than the latter. The former more general than the latter. The statement made here is more general than the statement that nothing you say will be used against you for a few reasons, Your Honor. So the statement here just alluded to trouble generally, and in context, the trouble that was the focus of the interview were the charges that Mr. Johnson was facing. That's how he started the interview. He asked, what charges am I facing? What's going on? And then during the interview, and shortly before the detective made the statement, the alleged false promise of leniency, the defendant was again inquiring, what are the charges I'm facing? So in context, we think the general allusion to trouble most clearly referred, if anything, to the charges that Mr. Johnson faced. To press you a little bit on that, this happens at an hour and six minutes in, right in the beginning of phase three. And when you watch the video and you read the transcript, it just seems like the tenor of the room had changed at that point. And there's a longer statement being made by the officer who has greater familiarity with the defendant, and then this statement becomes as part of it, and the nature of the responses being given by Johnson seemed to be much more detailed in that phase three than the earlier two phases. How does that context factor into the inferences we're talking about on the statements? Your Honor, I think to the extent the tenor changed at all, it may have been driven by the fact that the conversation had come pretty close to settling on maybe some cooperation would be possible. It wasn't a sure thing, but the conversation was getting towards the point of an agreement to cooperate. So in that sense, maybe the back and forth was a little bit more amicable. That said, questions about the tenor of the room and things like that, those are very fact-based and difficult to review on this record. And that's one reason why we think that the defendant hasn't carried their burden on appeal of showing in the first instance that any of Mr. Johnson's statements were involuntary. I'd also point the court to this court's decision in Rutledge. The defendant relies on Rutledge, but I think at the end of the day, it's quite helpful to us. Because there, the court ultimately held that the statements that officers made did not render the defendant's subsequent statements involuntary. And what the officer said there was actually quite similar to what was said here. So I read the decision as saying that the officer said, if you confess, your cooperation will be helpful and you won't get any more, you'll receive a net benefit. Here, essentially what the officers were alleged to have said was that if you say this, you won't receive any net trouble. That's actually quite similar to Rutledge, I think, and the bottom line holding of Rutledge in that sense ultimately favors us. So that's our view on the alleged false promise of leniency. There's another reason here that I think Judge St. Eve, you flagged, which is that at minimum, it wasn't clear or obvious that the district court should have sua sponte excluded Mr. Johnson's statements. In fact, the party presentation principle would have encouraged the district court not to inject issues on behalf of the defendant. And at the bare minimum, even if we grant that the district court had some amount of discretion or some amount of ability to inject the issue on behalf of the defendant, a decision to decline to exercise discretion isn't plain error. That's one thing that this court said recently in the United States against Robinson in 2025. So I think for that reason, the district court didn't plainly err by not sua sponte raising the issue. Finally, with the time remaining, I want to just flag our harmless error point, which is similar to our substantial rights and judicial proceedings point. This all hinges on what the district court did at sentencing, or at the re-sentencing. The statement was a little more general than statements that we have found clearly satisfy harmless error. How do you respond to that? Your Honor, I think it sufficed. The district court, any district court, can always say more. A district court can always spend more and more pages discussing the issue. But what the district court said here, I think, did suffice. The district court addressed the parallel scenario by saying, even if she had ruled differently on the objections, and it was front and center, I think the exchanges in the discussion here today has confirmed that it was front and center that those objections would have led to a guideline range of 120 to 135 months on the drug and firearm possession counts. So that was front and center when the district court is saying this. And so under that parallel scenario, a guideline range of 120 to 135 months, which is the guideline range that the defendant is now seeking, the district court explained, I would still impose the same sentence. And the district court pointed to important aspects of the record in explaining that decision. She pointed to the defendant's criminal history, very troubling criminal history, persistent, and the defendant's reaction to past reduced alternative sentences that the state had to afford him. What about the fact that the court didn't reference the meth amount or the guideline calculation? I think that favors us at the end of the day, Your Honor, because it shows that the district court's sentence wasn't pegged to exactly how much drug quantity was involved here. So whether the district court should have considered a portion of the video on drug quantity or should have added up the drug quantity differently, as the defendant wants, the drug quantity was not driving her decision here. It was other factors, especially the defendant's troubling criminal history. So I think that aspect ultimately favors us. And I would also emphasize that the district court is very familiar with this case. This is a resentencing. The district court has seen this case, knows this defendant quite well. And so her explanation for why she thought 135-month sentence on the first two counts or the drug and the firearm possession counts was appropriate, I think, was based on her close familiarity with this case. And for that reason, I think any error here was harmless. It didn't affect the defendant's substantial rights, and it did not gravely impugn the proceedings below. Thank you, Mr. Falvey. Thank you, Your Honor. We would ask the court to affirm. Thank you. Very good. Thank you. Mr. Patton, we'll move to you now. Two minutes for rebuttal. Thank you, Your Honor. On the inoculating statement, not only was it general, it didn't address what the guideline objections were. Her stated reasons for giving the same sentence all had to do with criminal history, which, by the way, the two prior drug convictions were 23 years old, one of which involved .71 grams of cocaine, and that's in the PSR. With regards to Rutledge and the actual language used here, in Rutledge, what the cop said is, hey, all cooperation is helpful, just as general. That's nowhere close to what we have here. And that's why Rutledge said, look, there's a range, right? There's a range between, hey, this could help you, or we'll let your cooperation be known to the prosecutor or the judge, and on the other end, a promise of, hey, this isn't going to hurt you. This isn't going to put you in a worse position there than you're already in. And I put this in our opening brief, but that's the language we use, the non-lawyer language to try and explain to a client about what immunity means. What you say is, look, there's no guarantee this is going to help you, but as long as you're honest, it's not going to hurt you. It's not going to, I literally tell people, it's not going to put you in a worse position than you're already in. It's just how you explain what immunity is to a non-lawyer. And that's exactly what Wagner said. He's like, hey, just be honest. And Chief Judge Brennan, I completely agree that the tenor of the third phase is different because they've moved on to, all right, we're going to try and work with you to cooperate. And all right, we're trying to figure stuff out here in that context. So and I personally, I don't know Wagner, but just from watching it, I doubt he was really intending to screw over Mr. Johnson. I think he was an experienced narcotics officer that's going to work with somebody through cooperation who's saying, hey, man, just relax. Just be straight up. We're just trying to figure this out here. And that's what Mr. Johnson, what any reasonable listener would have taken from that. Thank you very much, Mr. Patton. Thank you very much, Mr. Falvey. The case will be taken under advisement. Thank you.